# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

EDWARD VOORHIES,                )
                                )
    Plaintiff,               )
                                )
VS.                             )    No. 05-1012-T
                                )
JO ANNE B. BARNHART,            )
the COMMISSIONER OF SOCIAL      )
SECURITY,                       )
                                )
    Defendant.               )

---

## ORDER AFFIRMING COMMISSIONER'S FINAL DECISION

Edward Voorhies ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner"), which denied Claimant's applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). See 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff argues that the Commissioner's decision is not supported by substantial evidence in the record as a whole, that omissions in the transcript of the administrative hearing preclude meaningful judicial review, and that either or both of these factors justify reversing and remanding the Commissioner's decision for additional proceedings pursuant to sentence four of 42 U.S.C. § 405(g). The Commissioner asks the court to affirm the agency's decision to deny benefits. For the reasons that follow, the Commissioner's decision is AFFIRMED and Claimant's

This document entered on the docket sheet In compliance
with Rule 58 and/or 79 (a) FRCP on   10 | 6 | 05



request for a new hearing is DENIED.

Claimant filed his applications for benefits on December 12, 2002, with a protective filing date of November 18, 2002. (R. at 11, 41, 48–50, 58). The Commissioner denied Claimant's applications initially and upon reconsideration because she determined that Claimant could not establish that he suffered from a "disability" within the meaning of the Social Security Act ("the Act") and the Commissioner's regulations. (R. at 28–30). An Administrative Law Judge ("ALJ") subsequently presided at a hearing where Claimant was permitted to submit evidence and to testify regarding his allegedly disabling conditions. (R. at 168–185). The ALJ determined that Claimant was not disabled and, therefore, ineligible for benefits under the Act. (R. at 11–18). The ALJ's opinion became the Commissioner's final decision on November 23, 2004, when the Appeals Council declined Claimant's request for review. (R. at 4–6). Pursuant to §§ 405(g) and 1383(c)(3) of the Act, Claimant now appeals that decision.

Sections 405(g) and 1383(c)(3) provide for judicial review of the final decisions of the Commissioner with respect to claims of entitlement to benefits under the Act. The scope of judicial review is limited to determining whether or not the Commissioner's factual findings are supported by substantial evidence in the administrative record as a whole and also whether or not the Commissioner applied the proper legal standards. 42 U.S.C. § 405(g); see also Wyatt v. Sec'y of Health & Human Servs., 974 F.2d 680, 683 (6th Cir. 1992); Cohen v. Sec'y of Health & Human Servs., 964 F.2d 524, 528 (6th Cir. 1992);

Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). The district court must affirm the Commissioner if there is at least more than a mere scintilla of relevant evidence in the record, taken as a whole, that supports the decision. See, e.g., Wright v. Massanari, 321 F.3d 611, 614 (6th Cir. 2003). Even if a preponderance of the evidence weighs against the agency's decision, see Bell v. Comm'r of Soc. Sec., 105 F.3d 244, 245 (6th Cir. 1996), that decision may not be disturbed if a "reasonable mind *might* accept [the evidence relied on by the Commissioner] as adequate to support [the Commissioner's] conclusion." Id. (citing Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (in turn citing Richardson v. Perales, 402 U.S. 389, 401 (1971))) (emphasis added).

## I.

On the date of the hearing in this case, Claimant was a fifty-one year old male individual who had completed high school. (R. at 12, 170–71). Claimant allegedly became disabled on August 31, 2002, although he had not been employed since May of 2002 and he had not worked full-time since 1995. (R. at 90–92, 171). His work history, from the most recent to the most remote date, consisted of part-time work as a library clerk, full-time work as a warehouseman, a hardware sales and service clerk, a medical equipment sales clerk, an office supplies deliveryman, and a material handler in an automobile manufacturing plant. (R. at 90–96). Since 1995, Claimant has allegedly suffered from hypertension, chronic edema and cellulitis in his lower extremeties, heel spurs, swelling, "bow" legs, knee

pain associated with mild osteoarthritis, lower-back pain caused by mild disc degeneration, several recurring bacterial infections, diabetes Type II, and neuropathy associated with his diabetes.[1]  (R. at 12, 14, 69, 84, 171).  Claimant attributes his unemployment to the cumulative pain and discomfort associated with all of these conditions and to the debilitating effects of his prescription medications.  (R. at 12–14, 29, 33, 69, 84, 87, 97, 98, 100–101, 164–165, 171, 175–177, 179, 181–183).

At the hearing, Claimant testified that he takes a 750 milligram dosage of Hydrocodone every six hours to alleviate his pain.  (R. at 175).  According to Claimant, this narcotic causes grogginess.  Id.  He spends a normal day sleeping (because of lack of regular sleeping patterns and because of the pain medication), eating, watching television, and surfing the Internet.  (R. at 181).  His foot pain is allegedly so severe that he cannot bear to have a fan blow on his feet, to wear shoes, or even to wear socks unless necessary.  (R. at 176).  Although he can cook, it is painful for him to stand on the kitchen floor.  Id.  If Claimant goes grocery shopping, he has to take periodic breaks to sit and to massage his feet.  Id.  He has not been able to play golf since 2001 or 2002.  (R. at 180).  When he is asked to engage in leisure activities, such as golf and/or walking, he declines.  (R. at 181).  He can drive, shop, and do housework.  Id.  He occasionally has friends come over to his home.  (R. at 182).

Claimant testified that he has been receiving state unemployment compensation since

---

[1]According to Claimant, his neuropathy causes him to experience pain, numbness, tingling, and burning in his hands, fingers, feet, and toes.  (R. at 33).

4

he last worked in 2002. (R. at 177). He also receives some support from his mother, and he carries a credit card. (R. at 177–78). He lives in government-subsidized housing and has no insurance. (R. at 178). However, the transcript of the hearing does not indicate how extensively either the ALJ or Claimant's attorney explored Claimant's financial status. (See R. at 183–84).[2] Nevertheless, the ALJ interpreted Claimant's explanation for the absence of an extensive medical record to be Claimant's "lack of money." (R. at 15). Claimant testified that, notwithstanding the limited record, his pain and suffering were so extreme that there was no job that he could perform. (R. at 178).

The medical evidence before the ALJ was limited. The first exhibit consisted of an eighteen-month history of continuous treatment during 1993 and 1994 by Dr. Rodney Staton at the Family Foot Care Center in Jackson, TN. (R. at 103–18). At the time, Claimant was working in a periodicals distribution warehouse where he had to stand between eight and ten hours per day. (R. at 70, 112). He first complained of flat feet and severe soreness in his heels, on the bottom of his feet, and in his legs. (R. at 117). On several occasions during this period, Dr. Staton wrote Claimant's employer a doctor's statement. (R. at 104, 109, 113). After trying several courses of treatment,[3] Dr. Staton determined that Claimant would

---

[2]Claimant, in his reconsideration quest, stated that he was uninsured and unable to afford to see a neurologist even though one of his physicians had recommended it. (R. at 101). Claimant also told the Commissioner's consultative physicians that he had not been able to afford electromyography or other testing.

[3]Claimant apparently discontinued treatment at one point during this period of treatment because of "some type of insurance problems he was having." (R. at 111).

either have to undergo endoscopic foot surgery or learn to endure the pain. (R. at 103). Dr. Staton also advised Claimant to seek employment that would be less stressful on Claimant's feet. Id. Claimant followed the latter course of advice and, in early 1995, began working part-time as a college library clerk. (R. at 90). Despite Dr. Staton's advice about Claimant seeking a different type of work, which Claimant followed, there is no record that Dr. Staton opined that Claimant could not in fact engage in some form of gainful employment.

The next medical exhibit before the ALJ consisted of eighteen pages of mostly illegible records/hand-written notes made between September of 1997 and June of 2003. (R. at 123–41). Claimant's primary care physician was Dr. Robert Dunnebacke at the Medical Clinic of Jackson. (R. at 141). It does not appear from the records covering the period in question that Claimant was treated for or even complained of any of his current conditions until as recently as 2001.[4] (R. at 131–41). Sometime in 2001, Claimant began telling Dr. Dunnebacke that he was experiencing swelling in his feet and ankles and was having difficulty at his part-time library clerk position because of the amount of sitting required. (R. at 131). The record further reveals that, sometime thereafter, Dr. Dunnebacke began prescribing and re-prescribing Hydrocodone. (R. at 124–30).[5] There is no record that

---

[4]This observation obviously excludes the previous period of treatment that occurred in 1993 and 1994, which is not part of the "period in question."

[5]The legible records suggest that Dr. Dunnebacke saw Claimant for high blood pressure, cellulitis, and edema between 2001 and 2003. (R. at 124–30). There appear to be several other prescriptions that occurred during that time, but Hydrocodone is the only one that Claimant connects to his claimed disabled condition.

Dr. Dunnebacke ever restricted Claimant from working or advised Claimant to quit working.

The third exhibit was the result of a consultative examination performed by Dr. Donita Keown on behalf of the Tennessee Disability Determination Services (TDDS) in April of 2003, which was after the Claimant had first applied for benefits. (R. at 119). Dr. Keown pointed out that Claimant smoked two packs of cigarettes every day and that Claimant drank alcohol "occasionally." (R. at 120). Dr. Keown noted that Claimant told her that he had not been able to afford to have an electromyography or other testing of his lower extremeties and that he did not have health insurance, but he had been suffering from pain for the previous seven or eight years. (R. at 119–20). With respect to the records of Claimant's primary care and treating physicians that were available, Dr. Keown noted,

> Primary care physician . . . has been seen about his medical problems. He was last seen by that physician March 2003. Medical records are reviewed however fairly illegible. The treating physician's name is not enclosed nor is the date of the visit enclosed, simply a problem list and a diagnosis with 1 single page of notes that is essentially illegible.

(R. at 120). Dr. Keown then went on to observe that Claimant could walk without a limp or assistive device and that Claimant showed no problems getting out of his chair and onto or from the examining table. Id. The doctor noted a good range of motion and no swelling or bony abnormalities in both of Claimant's lower extremities. (R. at 121). Also, Dr. Keown pointed out that Claimant did not suffer from muscle atrophy, joint enlargement, or sensory deficits. Id. The doctor's "[a]ssessment" concluded that Claimant suffered from venous insufficiency in his lower extremities. (R. at 122). However, Dr. Keown did not

7

find any evidence of cellulitis. Dr. Keown also found mild osteoarthritis in Claimant's knees

that would improve with weight loss and mild degenerative disc disease. Id. Finally, Dr.

Keown opined that,

> [C]laimant could sit 6 hours in an 8 hour day, [and he could] walk or stand
> 4–6 hours in an 8 hour day. Frequent lifting 10–15 pounds, occasional lifting
> 25–30 pounds.

Id. Concerning Claimant's subjective complaints of pain, Dr. Keown said,

> [These complaints] suggest[] peripheral neuropathy of an unknown etiology.
> Further testing is warranted to delineate the extent of the problem and possible
> causes.

(R. at 122).[6]

The next exhibit covered the period of June 5 until June 26, 2003. Those records

showed that Claimant began visiting the East Jackson Family Medical Center[7] complaining

of body pain after he was initially denied benefits and after he had quit his part-time job.

(R. at 163).[8] He complained of tiredness, trouble sleeping, leg pain, numbness, tingling,

depression, nervousness, aching, stiffness, and trouble urinating. (R. at 161). Doctors at the

medical center diagnosed Claimant with Diabetes II and diabetic neuropathy based on

---

[6]The Commissioner initially denied benefits based on the records from 1993–1994, the "essentially illegible" records from Dr. Dunnebacke, and the consultative examination of Dr. Keown. (R. at 66).

[7]Claimant's testimony suggests that Claimant was attending East Jackson Family Medical Center on a charity basis. It does not appear that Claimant was pursuing the "further testing" that Dr. Keown had suggested was "warranted" back in April of 2003. (See R. at 122).

[8]Claimant was apparently still under the care of Dr. Dunnebacke at this time and was still taking Hydrocodone.

8

physical examinations, laboratory tests, and Claimant's subjective complaints and history. (R. at 151–52; 154–63). The doctors prescribed Glucophage samples. (R. at 155). The physicians at the East Jackson Medical Clinic did not restrict Claimant from working or offer opinions as to how many hours Claimant could walk or sit in a given day.

Last, the ALJ considered a June 22, 2003, "Residual Functional Capacity Assessment" that was prepared by another government consultative physician. (R. at 142). That physician diagnosed Claimant primarily with cellulitis and secondarily with "[b]ack D/o." Id. The consultant found Claimant capable of lifting fifty pounds occasionally and twenty-five pounds frequently. (R. at 143). The consultant physician determined that Claimant could walk and sit, or walk, or sit, up to approximately six hours in an eight-hour workday, with normal rest periods. Id. In the section entitled "[e]xplain how and why the evidence supports your conclusions," the consultant physician made a checkmark. (R. at 143). In the section entitled "[i]s a treating or examining source statement(s) regarding the claimant's physical capabilities in file," the physician marked both "[y]es" and "[n]o." (R. at 148). In the section entitled "[i]f yes, are there treating/examining source conclusions about the claimant's limitations or restrictions which are significantly different from your findings," the physician stated "[y]es" but did not specify what the other limitations or restrictions were, where in the file they were located, or why they were unwarranted. Id. The next page contains some notes that may have been intended to explain the consultative physician's opinion and to discredit those that were "significantly different," but the only

9

legible portion that might be of assistance states that "[sic] are too [sic] for the objective [sic]." (R. at 149).

Based on the record, the ALJ concluded that Claimant was not "disabled" within the meaning of the Act and administrative regulations. The ALJ therefore denied Claimant's applications for benefits. (R. at 18). In particular, the ALJ found that:

1. Claimant satisfied the nondisability requirements for a period of disability and DIB as provided in section 216(i) of the Act, 42 U.S.C. § 416(i), and was insured for benefits through the date of the ALJ's decision.

2. Since August 31, 2002, the alleged onset date, Claimant had not engaged in "substantial gainful activity" within the meaning of the Act and regulations.

3. Claimant's impairments were "severe" under 20 C.F.R. §§ 404.1520(c), 416.920(b).

4. Those impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. *Claimant's subjective complaints of pain were not totally credible.*

6. *Claimant retained the residual functional capacity (RFC) to perform light work.*

7. Claimant could not perform any of his past relevant work (20 C.F.R. §§ 404.1565, 416.965).

8. Claimant was an "individual closely approaching advanced age." (20 C.F.R. §§ 404.1563, 416.963).

9. Claimant had a "high school (or high school equivalent") education. (20 C.F.R. §§ 404.1564, 416.964).

10. Claimant had no transferable skills from any past relevant work and/or transferability of skills was not an issue. (20 C.F.R. §§ 404.1568, 416.968).

11. *Claimant retained the RFC to perform the full range of light work.* (20 C.F.R. §§ 404.1567, 416.967).

12. Based on Claimant's exertional capacity for light work, his age, his education, and his work experience, Medical-Vocational Rule 202.13 compelled a finding of "not disabled."

13. Claimant was not under a "disability" as defined in the Act at any time through the date of the decision. (20 C.F.R. §§ 404.1520(g), 416.920(g)).

(R. at 17) (emphases added). The italicized portions of the ALJ's findings are the subject of this appeal.

## II.

The Act defines "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the authority delegated by Congress, the Commissioner has promulgated regulations that prescribe a five-step sequential analysis for the Social Security Administration to utilize in determining whether or not an individual is "disabled" within the meaning of the Act. 42 U.S.C. §§ 405(a), 421(k), 1383(d)(1); 20 C.F.R. §§ 404.1505(a), 404.1520, 416.920. Specifically, the Administration conducts its determination of disability or non-disability in the following order:

1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

11

2.    An individual who does not have a severe impairment will not be found to be disabled.

3.    A finding of disability will be made without consideration of vocational factors if an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment found in 20 C.F.R. Part 404, Subpart. P, Appendix 1.

4.    An individual who can perform work that he has done in the past will not be found to be disabled.

5.    If an individual cannot perform his past relevant work, other factors including age, education, past work experience, and residual functional capacity will be considered to determine if other work can be performed.[9]

20 C.F.R. § 404.1520. If, at any point during the sequence, the agency determines that a claimant is not disabled, the analysis ceases and further consideration is unnecessary. 20 C.F.R. § 404.1520(a)(4); see also Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Furthermore, the burden of establishing disability at any step rests with the claimant unless the process proceeds to step five. See e.g., Bowen v. Yuckert, 482 U.S. 137, 146, 146 n.5 (1987). If a claimant survives the first four steps, the Commissioner must establish that the claimant is able to perform other work that exists in the national economy. See, e.g., id.; Longworth v. Comm'r, 402 F.3d 591, 595 (6th Cir. 2005). A finding at step five requires the Commissioner to take into account the agency's assessment of a claimant's RFC and the claimant's age, education, and work experience before determining that "other work can be performed." 20 C.F.R. § 404.1520(a)(4)(v); see also Longworth, 402 F.3d at 595 (citing Jones v. Comm'r, 336 F.3d 469, 474 (6th Cir. 2003)).

---

[9]The regulation states that the Commissioner will consider "*our assessment of* [a claimant's] residual functional capacity." 20 C.F.R. § 404.1520(a)(4)(v) (emphases added).

Here, the ALJ resolved the case in the Commissioner's favor at step five. (R. at 16). Consistent with the applicable regulations, the ALJ first considered Claimant's age, education, and work experience. Id. The ALJ then found that Claimant retained the exertional RFC to perform all of the demands of the full range of light work and that Claimant possessed no non-exertional limitations. Id. The ALJ then matched Claimant's RFC and his age, education, and work experience with Medical-Vocational Rule 202.18, Appendix 2, Subpart P., Regulation No. 4 ("the Grid"), which indicated the existence of "other jobs in the national economy" that the Claimant could perform. Id. Accordingly, the ALJ held that Claimant was not "disabled" within the meaning of the Act.

Claimant first asserts that the ALJ's finding that Claimant retained the RFC to perform all of the strength demands of the full range of light work was not supported by substantial evidence in the record as a whole. In particular, Claimant argues that the ALJ did not consider the effects of diabetic neuropathy on Claimant's RFC and that the ALJ disregarded "the limitations on standing set out by Dr. Keown, the social security consultative examining doctor." (Cl.'s Br. at 6). As an additional or alternative basis for reversal, Claimant contends that the record is so incomplete or inaccurate that the case must be reversed and remanded for a new hearing. Id. at 10; (Cl.'s Reply Br. at 6). The Commissioner disagrees with both of Claimant's contentions.

III.

A.

Claimant argues that the ALJ's RFC finding gave "no weight at all" to the "effects" of diabetic neuropathy, even though the neuropathy was diagnosed by a treating physician. (R. at 7).  By framing the argument in this manner, Claimant seeks to refrain from directly attacking the ALJ's finding that *Claimant* was not credible by indirectly attacking that same finding under the guise of the "treating physician rule."   The treating physician rule, if applicable, would normally require according greater "weight" to a treating physician's opinion that Claimant was disabled even if the ALJ still believed that Claimant was exaggerating his pain. See 20 C.F.R. § 404.1527(d)(2); see also, e.g., Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).   However, the treating physician at East Jackson Family Medical Center did not render an opinion about the "effects" of diabetic neuropathy in this case.

Instead, the treating physician said absolutely nothing about the effects of neuropathy other than recording those effects as *Claimant* related them.   (R. at 151) (noting that Claimant "still [complains of] neuropathic pain[] . . . [p]ins/needles on bottom of feet, legs[;] [c]annot stand to have socks on feet").   For example, when the treating physician wrote that Claimant "[c]annot stand to have socks on feet," the physician was not agreeing with Claimant or "ordering" Claimant not to wear socks; he was merely writing down that Claimant said it hurt to put socks on.  Claimant later made the same or similar subjective

14

complaints to the ALJ at the administrative hearing. (R. at 176) ("I don't even wear socks unless I have to."). The ALJ, however, believed that Claimant's subjective description of the extent of his pain was exaggerated. (R. at 15). The ALJ's assessment of these complaints is entitled to great respect on appeal. E.g. Warner v. Comm'r, 375 F.3d 387, 392 (6th Cir. 2004); Jones v. Comm'r, 336 F.3d 469, 475–76 (6th Cir. 2003); Buxton v. Comm'r, 246 F.3d 762, 773 (6th Cir. 2001); Heston v. Comm'r, 245 F.3d 528, 536 (6th Cir. 2001); Walters v. Comm'r, 127 F.3d 525, 528 (6th Cir. 1997).

In rejecting the very same subjective complaints of pain that Claimant had previously related to his physician, the ALJ was not ignoring "treating source evidence" of disability. (But see Pl.'s Br. at 7 for that argument). The ALJ did not disagree that Claimant was diagnosed with or suffered from diabetic neuropathy. (R. at 14). The fact of that diagnosis by a treating physician, however, was not "evidence of disability" and certainly did not invoke the "treating physician rule" in and of itself. To the contrary, because the diagnosing physician clearly gave no objectively substantiated opinion *of his own* regarding the extent of Claimant's *suffering* or Claimant's *ability to perform work*, there was no relevant "treating source evidence" that the ALJ could have conceivably ignored in this case.

In short, Claimant's attempt to label the ALJ's credibility finding as a rejection of "treating source evidence" is unpersuasive. In fact, the ALJ expressly relied on the *lack of* such evidence in rejecting Claimant's own opinion that the diagnosed diabetic neuropathy

15

precluded Claimant from working at any job. (R. at 15).[10] Thus, Claimant's first objection

to the ALJ's RFC finding is without merit because it was *Claimant's* opinion about the

effects of his neuropathy, not a treating physician's objective evidence of those effects, that

was not accorded substantial "weight" by the ALJ.

B.

Claimant's next argument is that the ALJ's RFC finding is not supported by

substantial evidence in the record as a whole because the ALJ did not discuss the fact that

Dr. Keown restricted Claimant to "less than six hour[s]" of standing or walking in an eight

hour workday. (Pl.'s Br. at 9). The Commissioner disagrees with Claimant's interpretation

of Dr. Keown's assessment and also argues that the remainder of the record, as a whole,

contains independent and substantial evidence supporting the ALJ's RFC finding.

(Comm'r's Br. at 8). The disputed medical record states that:

> [C]laimant could sit 6 hours in an 8 hour day, [and he could] walk or stand
> 4–6 hours in an 8 hour day. Frequent lifting 10–15 pounds, occasional lifting
> 25–30 pounds.

(R. at 122) (assessment of Dr. Keown). Claimant contends that this assessment flatly

contradicts the ALJ's finding that Claimant can perform the demands of the full range of

light work. The applicable regulation defines "light work" as involving:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds. Even though the weight lifted may be very

---

[10]This answers Claimant's argument that the ALJ failed to "articulate reasons" for rejecting Claimant's subjective account of the extent of pain. (Pl.'s Br. at 7) (quoting Zblewski v. Schweiker, 732 F.2d 75, 78 (7th Cir. 1984).

little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b); 416.967(b). In a 1983 ruling, the Administration explained that the full range of light work requires that a claimant be capable of "*standing or walking*, off and on, *for a total of approximately 6 hours of an 8-hour workday*." SSR No. 83-10 (1983) (emphases added).

Claimant interprets Dr. Keown's assessment as a "limit[ation]" of Claimant to a total of less than six hours of combined standing and walking in an eight-hour workday. (Cl.'s Br. at 9). He then faults the ALJ for finding that Claimant could perform the demands of the full range of light work in light of Dr. Keown's assessment. The Commissioner, however, interprets Dr. Keown's assessment as bringing Claimant *within* the class of persons capable of performing the full range of light work. Specifically, the Commissioner reads the record to state that Claimant is capable of either walking or standing up to six hours every eight-hour day. (Comm'r's Br. at 8). The Commissioner's and the ALJ's reading of this record are consistent with each other.

The ALJ's reading of the assessment is reasonable. The Social Security Ruling in question requires that a claimant be able to either walk or stand, off and on, for a total of *approximately* six hours out of eight hours. Alternatively, a claimant could spend *approximately* six hours alternating between walking and standing and be qualified to

17

perform the full range of light work. Another possibility could be that a claimant walks as few as three hours and stands as few as three hours, for a total of six hours. In any event, even if Dr. Keown's report is ambiguous, the court cannot say that the ALJ "disregarded" it simply because the ALJ gave it an interpretation that favored the Commissioner.

Moreover, the ALJ's RFC finding is buttressed by other record evidence and Dr. Keown's report must be read in the context of that other evidence. For example, Dr. Keown did unambiguously state that Claimant could frequently lift as must as fifteen pounds and could occasionally lift as much as thirty pounds. (R. at 122). The doctor recorded that Claimant did not show any significant signs of discomfort, that he could walk without limping, and that he was able to get out of his chair and move around without any problems. (R. at 15). The doctor noted the lack of muscle atrophy, joint enlargement, and sensory deficits. Id. Finally, Dr. Keown reported that Claimant retained a good range of motion in both of his lower extremeties and in his lower back. Id. In light of these other findings in Dr. Keown's report, the ALJ's interpretation of his final assessment as *permissive* rather than restrictive cannot be faulted.

In short, the ALJ read Dr. Keown's report in light of the doctor's otherwise positive assessment, and in light of the remainder of the record evidence, and concluded that Claimant retained an exertional RFC sufficient to perform the demands of the full range of light work. Even if the court were to believe that Dr. Keown's assessment was ambiguous, there was other evidence in the record that provided substantial support to the ALJ's finding.

Therefore, Claimant's second argument does not provide a basis for remand.

IV.

Claimant's last argument is that the record of the transcript contains too many omissions. In other words, the court cannot find "substantial evidence" supporting the Commissioner because there are some inaudible or omitted portions of the hearing that may have supported Claimant. The Commissioner, on the other hand, maintains that a remand in this case is unnecessary.

Claimant's first complaint is apparently that the hearing transcript omits testimony in which Claimant explained that he had received charity care, due to poverty, at the East Jackson Medical Clinic. However, the record is clear that the ALJ was aware of and considered the fact that Claimant had received such charity care. (R. at 14) (noting that the Claimant was diagnosed with diabetes and diabetic neuropathy). Nevertheless, the ALJ did not believe that any of the records that were produced in the course of such charity care substantiated Claimant's subjective complaints. Id.

Claimant's second, and principal, complaint is that the ALJ was not sensitive to Claimant's financial circumstances in faulting Claimant for not producing a more extensive record of medical treatment for his alleged disabling pain. Claimant suggests that the omitted parts of the transcript deal with evidence that Claimant could not afford treatment, (Cl.'s Br. at 3–4), but the ALJ certainly did not discuss such testimony in his opinion. (R.

at 11–18).  The lack of a longitudinal medical record substantiating subjective complaints of disabling pain is a factor that supports a finding that a claimant is not disabled.  See, e.g., Kimbrough v. Sec'y of Health & Human Servs., 801 F.2d 794, 797 (6th Cir. 1986).  Poverty may legally excuse the failure to seek treatment, however, and if a claimant is financially incapable the ALJ may not discredit his subjective complaints on the sole basis that no extensive medical history supports the claimant's complaints.  E.g. Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) ("[I]t it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.") (quoting Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984); see also Strong v. Soc. Sec. Admin., No. 02-5604, 2004 U.S. App. LEXIS 1772, at **13–14 (6th Cir. Feb. 3, 2004) (noting that "a failure to seek examination or treatment may say little about a claimant's truthfulness").

Here, the Claimant's financial status was not a "determinative" factor in the ALJ's finding that Claimant was not totally credible.  See Strong, 2004 U.S. App. LEXIS 1772, at **14.  Instead, the ALJ focused on treatment that Claimant *did* receive, including the charity treatment, and the ALJ emphasized the absence of any significant work restrictions or treating source opinions that Claimant was disabled.  (R. at 15).  This evidence, on its own, contradicted Claimant's subjective complaints of pain.

As to the treatment that Claimant allegedly could not afford, the ALJ did not believe it.  Instead, the ALJ held that the reason for the lack of treatment was that Claimant's

condition was not as painful as Claimant represented. Id. Specifically, the ALJ found that Claimant was able to afford two packs of cigarettes every day and therefore could have paid for additional treatment if the pain was that severe. Id.; c.f. Strong, 2004 U.S. App. LEXIS 1772, at **13 (noting that such evidence was "readily relevant" to a claim that poverty precluded medical treatment). Thus, to the extent that the ALJ's rejection of Claimant's reason for the lack of extensive treatment was decisive, it was within the ALJ's discretion to reject that reason in light of the evidence showing that Claimant allocated the resources that he did have to smoking rather than to health care. In any event, it was not decisive given the fact that none of the doctors who did see Claimant thought he was disabled.

In short, the ALJ's credibility assessment was permissible. More important for purposes of Claimant's argument for remand, the ALJ's rejection of Claimant's financial justification was only part of that credibility assessment. Claimant urges that the court should remand the case because we cannot "assume" that the ALJ's finding of fact is consistent with the omitted portions of testimony. However, Claimant does not affirmatively represent that his testimony would contradict the ALJ's decision that Claimant's poverty argument was not credible. He does not contend that he testified that he had sought and, because of poverty, was denied more extensive care. He merely asks the court not to "assume" that he did not so testify, even though the ALJ plainly states that *no* such testimony was presented at the hearing. (R. at 15; but see Cl.'s Br. at 3–4).

The court will not "assume" that the ALJ affirmatively misrepresented the testimony

if the Claimant himself is not willing to state how his version of the testimony would actually change the outcome of the case. If Claimant had testified extensively and credibly about his poverty and his efforts to seek health care, the ALJ's reliance on the lack of treatment might be questionable. The problem for Claimant, however, is that he does not suggest that the omitted portions of the transcript will on remand contradict the ALJ's description of the testimony regarding poverty. Therefore, the court concludes that a remand is unnecessary.

In sum, the fact that the transcript contains some omissions in Claimant's testimony and in the questioning of Claimant does not justify remanding this case to the ALJ for a new hearing. There is substantial evidence in the whole administrative record that supports the ALJ's finding that poverty was not the reason that Claimant did not have a history of frequent treatment for his allegedly disabling conditions. Moreover, that lack of treatment was only one reason that the ALJ discredited Claimant's subjective testimony. Because Claimant does not argue that any of the omitted portions of the testimony would contradict the ALJ's finding that there was "no evidence . . . [Claimant] was denied . . . treatment because of insufficient funds or insurance," (R. at 15), a remand would do nothing to change the ALJ's finding regarding Claimant's credibility.

V.

In conclusion, Claimant has not persuaded the court that a remand to the

22

administrative agency is necessary.  First, there is substantial evidence upon the whole administrative record that supports the ALJ's RFC finding. The ALJ did consider the effects of diabetic neuropathy but found that Claimant's description of those effects was exaggerated. That finding did not contradict any treating source evidence because there was no objective treating source evidence regarding the effects of diabetic neuropathy.  Second, in concluding that Claimant retained the RFC to perform the full range of light work, the ALJ did not "disregard" Dr. Keown's report.  Finally, the omissions in the record did not preclude meaningful review. The ALJ's finding regarding Claimant's financial condition is supported by substantial evidence on the provided record, and Claimant does not affirmatively state that a remand to address the omissions will contradict or shed any new light on that finding.

VI.

For all of these reasons, the Commissioner's final decision is AFFIRMED and the

Claimant's request for a new administrative hearing is DENIED.

IT IS SO ORDERED.


_____
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

_5 October 2005_____
DATE

24

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 18 in case 1:05-CV-01012 was distributed by fax, mail, or direct printing on October 6, 2005 to the parties listed.

---

Joe A. Dycus
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Roger Stanfield
LAW OFFICE OF ROGER STANFIELD
P.O. Box 3338
Jackson, TN 38303--333

Honorable James Todd
US DISTRICT COURT